UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


ROBERT JAMES KEATON,

      Plaintiff,

v.                                     Case No. 4:19cv25-RH-HTC

WARDEN COKER,
DEPUTY WARDEN KARLENE A. MARCHANT,
COLONEL TIMOTHY R. NOLES,
CAPTAIN TARLOS THOMAS,
CAPTAIN NATHAN STRAWN,
CAPTAIN DAWSEY,
LIEUTENANT JACKSON, and
SERGEANT CEDRIC ANTHONY,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

This case is before the Court on Defendants' Motion for Summary Judgment. ECF Doc. 100.  The matter was referred to the undersigned Magistrate Judge for preliminary screening and report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  Upon review and careful consideration of the motion, evidence, and response (ECF Docs. 103 & 104)[1], the undersigned recommends the motion be GRANTED and judgment entered on behalf of all Defendants.

---

[1] Plaintiff filed a declaration, docketed as ECF Doc. 103.  The declaration also includes, at pages 4-42, the same written opposition also docketed as ECF Doc. 104.  ECF Doc. 104, however, contains additional exhibits.

## I.    BACKGROUND

Plaintiff, Robert James Keaton ("Keaton"), an inmate of the Florida Department of Corrections ("FDOC"), currently incarcerated at Lake Correctional Institution, brings this action against seven (7) correctional officers (Thomas, Marchant, Noles, Strawn, Dawsey, Jackson and Anthony) and the Assistant Warden for alleged violations of the Eighth Amendment, based on two events occurring while he was at Wakulla Correctional Institute.  ECF Doc. 62 at 9-10.  First, Keaton contends his Eighth Amendment rights were violated when he was placed on property restriction, which resulted in him having to sleep on the cell floor in only his boxers.  Keaton contends the cold temperature in the cell caused him to have an epileptic seizure, which caused a retinal detachment in his eye.  Second, Keaton claims after he returned from eye surgery on June 14, 2018, Defendants Thomas and Anthony used excessive force against him without provocation, which caused an exacerbation of the retinal injury.

Keaton also alleges a state law claim for assault and battery based on the June 14, 2018 incident.  All defendants are named in their individual capacities.  As relief, Keaton seeks $5.4 million in damages, a declaratory judgment that the acts alleged above were unlawful, and "[a]ny additional relief this court deems just, proper, and equitable." *Id.* at 10-11.

## II.    SUMMARY JUDGMENT STANDARD

To prevail on their motion for summary judgment, Defendants must show Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 248 (1986) (emphases omitted).  An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  *See id.*; *accord Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998 (11th Cir. 1992).

## III.    DISCUSSION

Defendants move for summary judgment on both Eighth Amendment claims. As to the conditions of confinement claim, Defendants argue the property deprivation did not rise to the level of a constitutional violation; there is no evidence Defendants had knowledge Plaintiff suffered from a serious risk of having a seizure

or suffering and eye injury; and the property deprivation did not cause any injuries. As to the excessive force claim, Defendants argue the evidence, including the video footage, shows any force used was necessary to gain Plaintiff's compliance.[2] Additionally, Defendants argue Plaintiff has failed to show Coker is liable as a supervisor and that, regardless, Plaintiff failed to exhaust his remedies as to Coker. Finally, Defendants argue Plaintiff is only entitled to nominal damages even if he were to establish a constitutional violation.

In support of their motion, Defendants submitted excerpts of Plaintiff's deposition; Plaintiff's disciplinary history; Plaintiff's medical records and the affidavit of Legal Nurse consultant Kellie Caswell; Deposition Excerpts of Dr. Logan Brooks; video footage of the June 14, 2018 use of force incident; use-of-force reports; a written reprimand on Thomas relating to a May 16, 2018 use of chemical agents; an "Inmate Request" addressed to the Warden complaining about the May 3, 2018 property restriction; and affidavits of Lisa Robison and Lawanda Sanders, two custodians of grievance records within the FDOC. *See* Exhibits to ECF Doc. 100.

---

[2] Alternatively, Defendants also argue they are entitled to qualified immunity. However, because the undersigned agrees there was no constitutional violation, the undersigned need not address the qualified immunity argument. *See Dalrymple v. Reno*, 334 F.3d 991, 997 (11th Cir. 2003) ("Because we find no constitutional violation ..., we need not address whether the constitutional rights at issue were clearly established.").

Keaton has submitted a written opposition to the motion (ECF Doc. 104) and a declaration under penalty of perjury supporting the opposition (ECF Doc. 103). In the declaration, Keaton adopts and incorporates the allegations in his second amended complaint. Also, attached to Keaton's opposition are Defendants' discovery responses, letters to the inspector general, incident reports, and medical records relating to the retinal tear.

### A.    Eighth Amendment Conditions of Confinement Claim

According to Keaton's sworn allegations in the second amended complaint, on May 3, 2018, Keaton was kicking at his cell door because confinement staff had covered a window in his cell door with a magnet. Defendant Thomas was called to Keaton's cell because of the kicking and when he removed the magnet saw that Keaton had placed a personal picture on the corner of a window, which Keaton contends was a photo of his mother. Thomas told Keaton to take the photo down and, although Keaton complied, he also stated to Thomas "I don't know who the f---- you think your (sic) talking to like that". ECF Doc. 62 at 4.

Although "[a]t no point did plaintiff exhibit any self-injurious behavior, nor did he attempt to destroy any state property or equipment," Thomas advised Keaton he was being placed on property restriction. *Id.* at 5. Everything was removed from Keaton's cell, including the pillow and mattress. Keaton was also ordered to remove his clothing other than his boxers.

Keaton alleges the cell was climate controlled, but nonetheless "the lack of heat was 'severe' enough" to cause him physical discomfort and that he continuously trembled and was deprived of sleep. ECF Doc. 62 at 5. Further, after he decided to sleep on the bare floor for warmth, he suffered an epileptic seizure three days later, on May 6. After the seizure, he was brought by prison officials to the medical area, where he noticed he had a migraine headache, had bitten his tongue, had lower middle back pain, had a small abrasion over his left eye and could not see out of his left eye. On May 24, an ophthalmologist diagnosed Keaton with a detached retina.

Thus, Plaintiff alleges Defendants Marchant, Noles, and Thomas deprived him "of basic human needs while housed in confinement, without penological justification". ECF Doc. 62 at 7, 9. He further alleges Defendants Strawn, Dawsey, and Jackson had knowledge of the deprivation and failed "to take reasonable measures to abate these conditions." *Id.* at 9.

The Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement. First, under the "objective component," a prisoner must prove the condition he complains of is sufficiently serious to violate the Eighth Amendment. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). Second, the prisoner must show the prison official "acted with a sufficiently culpable state of

mind" with regard to the condition at issue. *Hudson,* 503 U.S. at 8 (marks and citation omitted).

The undisputed evidence shows Plaintiff cannot make either showing. Plaintiff alleges he was denied articles of personal hygiene, sheets, a blanket, a mattress, and pillow. ECF 103 at 5. Plaintiff alleges he was on property restriction from "between 4 p.m. and 5 p.m." on May 3, 2018 (ECF Doc. 62 at) until "between 1 A.M. and 3 A.M." on May 6, 2018, when he had an epileptic seizure. *Id.* at 6 ¶ 22. In his declaration, Plaintiff states he "did not get [his] personal property returned to [him] until May 7, 2018." ECF Doc. 103 at 2. Thus, Plaintiff was on property restriction for approximately three days.

The Court initially found Plaintiff's allegations sufficient to pass screening and overcome a motion to dismiss because Plaintiff alleged the property deprivation was without a legitimate reason.[3] ECF Docs. 23, 54; *see Haines v. Kerner,* 404 U.S. 519 (1972). On summary judgment, however, the undisputed evidence shows Plaintiff was placed on property restriction for disrespecting officials. ECF Doc. 100-2 at 1.

Indeed, as set forth above, Plaintiff admits on May 3, 2018 he was "kicking repeatedly on his cell door due to confinement staff covering his window on the cell

---

[3] Plaintiff filed a second amended complaint after the motion to dismiss was decided to add a state law assault and battery claim against Thomas and Anthony. ECF Doc. 61.

door with a magnet." ECF Doc. 62 at 4. Plaintiff also admits when officials removed the magnet they found a picture obstructing the window, in violation of FDOC policy. See 100-1 at 7 (Pl. Dep. P. 22, admitting the window should not be obscured under FDOC policy). Further, Plaintiff admits when Thomas ordered Plaintiff to remove the picture, Plaintiff did so but was verbally abusive and used profanity on Thomas. ECF Doc. 62 at 4. Plaintiff attaches the property restriction form to the second amended complaint, which confirms he was placed on property restriction for disobeying verbal orders.[4] *Id.* at 13.

Although Keaton alleges he did not exhibit any self-injurious behavior, nor did he attempt to destroy any state property or equipment, this allegation is irrelevant because Defendants do not suggest that was the basis for the property restriction. Prison officials may place an inmate on property restriction for disciplinary infractions regardless of self-injurious behavior or destruction of property. *See Thomas v. Rodgers,* No. 3:13-CV-1052-J-32PDB, 2013 WL 6017327, at *4 (M.D. Fla. Nov. 13, 2013) (finding no cruel and unusual punishment claim in case where prisoner admitted he was ordered to go on strip status as a punishment for yelling); *Magwood v. Beem*, No. 4:14CV314-MW/CAS, 2015 WL 796242, at *16 (N.D. Fla. Feb. 25, 2015) ("Plaintiff's allegations indicate that Plaintiff was placed on strip in

---

[4] Although Plaintiff alleges in his declaration that he did not receive a DR for the property restriction incident (ECF Doc. 103 at 2) that is irrelevant as the basis for the property restriction was identified on the property restriction form and there is no evidence a DR was necessary.

conjunction with the issuance of disciplinary reports. Thus, these are not claims based on a malicious or sadistic desire to cause Plaintiff harm but as part of discipline."); *Wilson v. Carver*, No. 3:19-CV-1074-J-39JBT, 2020 WL 211066, at *1 (M.D. Fla. Jan. 14, 2020), *appeal dismissed,* No. 20-10418-F, 2020 WL 2114255 (11th Cir. Feb. 24, 2020) (finding no constitutional violation when strip status was imposed for a minor violation)

Moreover, the Eleventh Circuit has specifically held that being denied a mattress, bedding and hygiene items does not rise to the level of an eighth amendment violation. *See Alfred v. Bryant*, 378 F. App'x 977, 980 (11th Cir. 2010) (finding "sleeping on a steel bed without a mattress for eighteen days, though uncomfortable, is not so extreme as to violate contemporary standards of decency"); *Hamm v. Dekalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (having to sleep on a table or on a mattress on the floor is not an eighth amendment violation); *Woodson v. Whitehead*, 673 F. App'x 931, 932 (11th Cir. 2016) ("Confinement without clothing (other than boxers), bedding, or hygienic materials for 72 hours during the months of April and August in Florida is not the type of extreme prison conditions that create a substantial risk of serious harm"); *see also, Smith v. Wester*, Case No. 5:18-cv-192-TKW-HTC, 2020 WL 1678960, *10 (N.D. Fla. March 12, 2020) (finding allegations that Plaintiff was placed on placed on property restriction and

was forced to sleep on a cold steel bed did not rise to the level of a constitutional violation).

Likewise, Plaintiff's generalized allegation the cell lacked heat does not rise to a constitutional violation. In cases where a prisoner challenges the temperature or ventilation of the facility where they are housed, the court looks at both the severity and the duration of the condition in order to determine if the condition constitutes cruel and unusual punishment. *See Chandler*, 379 F.3d at 1295. The temperature must be such that it creates an unreasonable risk of serious damage to the prisoner's future health. *See Hernandez v. Florida Department of Corrections*, 281 F. App'x 862 (11th Cir. 2008). Physical discomfort alone is not sufficient. *Id.*

Plaintiff, however, fails to provide any evidence of what the temperature in the cell was or even say what the temperature in the cell was. Thus, he has presented no evidence from which a reasonable jury could conclude the temperature in the cell was so cold that Plaintiff was deprived of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 337 (1981). At this stage, Plaintiff cannot rest solely on an allegation that the cell lacked heat, particularly when Plaintiff admits the cell was "climate controlled" and the property deprivation occurred in May in Florida. *See Edler v. Gielow*, No. 3:08cv530/WS/EMT, 2010 WL 3958014 at 7 (Fla. N.D. October 7, 2010) (finding denial of mattress, pillow, sheets, hygiene items, and comfort items even in 60-degree temperatures was not the

type of extreme conditions that posed an unreasonable risk of serious damage to health or safety).

Plaintiff also cannot satisfy the subjective component of an Eighth Amendment conditions of confinement claim. In defining the deliberate indifference standard, the *Farmer* Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

Plaintiff, however, has presented no evidence to show that any of the Defendants knew of Plaintiff's seizure disorder, of the "lack of heat" in the cell, that the temperature would trigger a seizure, or that a seizure would result in injury to the eye. In fact, in his deposition, Plaintiff was asked, "did you actually personally tell any of them that you have – that you suffer from seizures?" and answered, "No, I didn't. But I – I – like I say, I – I didn't know I was going to have a seizure. I was -- I was still, you know, infuriated from being in -- in that -- in that cell in freezing cold." ECF Doc. 100-1 at 19.

Plaintiff argues Defendants must have known of the possibility of a seizure because he had a health pass to sleep on the bottom bunk. ECF Doc. 104 at 3. The health pass, however, does not indicate the reason for the low tier/low bunk pass.

ECF Doc. 100-3 at 91. Thus, even if Defendants had seen the pass, they would not have been alerted to Plaintiff's history of seizures. Moreover, in his deposition, Plaintiff admits he previously had "99 percent" of his seizures while sleeping in a bed, with normal bedding. ECF Doc. 100-1 at 13-14. This admission cuts against a finding that Defendants had reason to know the property restriction could cause a seizure and also cuts against a finding that the property restriction caused the seizure.

Likewise, Plaintiff does not dispute that Thomas placed him on property restriction in April 2018 for the same reason, disobeying orders by covering his cell window with personal items. ECF Doc. 62 at 15 (property restriction form attached to Plaintiff's second amended complaint). He was on that property restriction for three (3) days as well and did not have a seizure.

Finally, Plaintiff has presented no evidence from which a jury could reasonably infer that the seizure resulted in a retinal tear. To the contrary, the evidence presented by Defendants, namely the deposition testimony from Dr. Brooks, the ophthalmologist who performed surgery on Plaintiff's eye, completely refutes any such inference.

According to Dr. Brooks, Keaton suffered from a "chronic retina detachment," which "was not a recent event", but "resulted from a process that began at least 8 to 12 weeks earlier" or possibly even "six months earlier." Dr. Logan Brooks Dep., ECF Doc. 100-4 at 6-7. Plaintiff avers "Dr. Brooks admitted the center

point of the retina was suddenly lost," but that was not Dr. Brooks' testimony. Instead, what Dr. Brooks testified to was that although it was possible the center recently detached, it did not have "anything to do with trauma. I think it's just the evolution of a chronic detachment that finally breaks through." *Id.* at 14.

Additionally, Plaintiff's medical records show he complained of "no vision" in his left eye for the last 3.5 years on January 17, 2017. ECF Doc. 100-3 at 2. Also, he was diagnosed with a retinal detachment on February 7, 2018 – two months before the May 6, 2018 seizure – by a prison optometrist. *Id.* ¶ 11. Thus, his own complaints to prison medical staff confirm the ophthalmologist's opinion that the detached retina was chronic, long-established, and not associated with trauma.

Thus, the undersigned finds that summary judgment should be granted as to the Eighth Amendment conditions of confinement claim. Plaintiff has presented no evidence to establish either the objective or subjective components of the claim. Additionally, if Marchant, Noles, and Thomas did not violate the Eighth Amendment by placing Plaintiff on property restriction, then Strawn, Dawsey, and Jackson cannot be liable for failing to intervene.

## B.    Excessive Force Claim Against Thomas and Anthony

The Eighth Amendment prohibits the infliction of cruel and unusual punishments. U.S. Const. amend. VIII. In Eighth Amendment excessive force cases, the "core judicial inquiry" is "not whether a certain quantum of injury was

sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Bowden v. Stokely*, 576 F. App'x 951, 953 (11th Cir. 2014), quoting *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam) (quotation marks omitted) (concluding that a gratuitous beating by prison guards, even without injuries requiring medical attention, violated a prisoner's Eighth Amendment rights).

In determining whether the force was applied maliciously and sadistically to cause harm, courts consider the following factors: "a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response." *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *Hudson v. McMillian*, 503 U.S. 1, 10 (1992); *Fennell v. Gilstrap,* 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam). When considering these factors, the courts "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Fennell* 559 F.3d at 1217 (quotation marks omitted).

Plaintiff alleges that "within five minutes' of returning from having eye surgery, on June 14, 2018, Defendants Thomas and Anthony used "physical force against the plaintiff without need or provocation . . . maliciously and sadistically" in

violation of the Eighth Amendment.  ECF Doc. 62 at 10.  Plaintiff's allegations, however, are blatantly contradicted by the video evidence.  As will be discussed below, Plaintiff disobeyed officers' orders, continuously yelled profanities at them, and physically refused to go into two different cells.  It is clear that the use of force by officers was minimal at best and limited to only what was necessary to maintain control.  To say that any use of force was not provoked is simply not credible and is wholly unsupported.

The video evidence begins in the sally port where officers dressed in white and Keaton dressed in a blue jumpsuit can be seen standing and talking.  *See* ECF 100, Exh. 5.  While it is not entirely clear what the officers are saying to Keaton because of yelling from other inmates, it appears they are trying to get him to walk to the holding cell.[5]  For several minutes the officers are seen talking to Keaton, and none have him in even a custodial hold.  Then, as one officer appears to try to nudge Keaton forward, Keaton suddenly just goes limp to the ground and the officers can be seen trying to break his fall to the ground.  (3:18).  Keaton admits in the second amended complaint he declared a medical emergency and sits on the ground.  As will be discussed later, however, there could not have been a medical emergency because Keaton is belligerent throughout the entire incident, even after officers are

---

[5] According to Defendants, Plaintiff "repeatedly states 'oh no, that ain't happening, I ain't going over there man".  (Exhibit 5, 00:24-00:38).  He then says "I'm gonna call all the shot today"  (*Id.* at 1:56)."  The undersigned, however, could not decipher what was being said by Plaintiff.

finally able to get him into a regular cell and refused to be seen by medical personal for a post use of force examination.

Keaton alleges that after he refuses to get up "Defendant Anthony dove on top of the plaintiff." ECF Doc. 62 at 7. The video, however, shows no such conduct by Anthony or any of the other officers. Instead, the officers can be seen bending at the waist over Keaton. Officers try to lift him up, but Keaton did not allow them to do so and instead resisted and kicked at officers, resulting in officers having to drag him further into the sally port. (4:09 - 4:18). Keaton's argument that officers used force in the sally port "without need or provocation" is belied by the video. ECF Doc. 103 at 8.

Keaton alleges he was "dragged thirty to forty feet to the holding cell." ECF Doc. 62 at 8 ¶ 36. This is not true. While Keaton is dragged further into the sally port, out of the camera's view, he is not dragged to the holding cell.[6] The video shows officers carrying Keaton face down and off the ground from the sally port to the holding cell. (13:38). Keaton, however, fights going into the holding cell, and

---

[6] Although Plaintiff is briefly taken out of site of the camera, Plaintiff does not allege Thomas or Anthony used excessive force after they drag him further into the sally port and before officers carried him to the holding cell.

the handheld camera footage, Exhibit 6, captures the officers' attempts to gain control of Keaton inside the holding cell.[7]

In the handheld video footage, Keaton can be seen partly in a small room, apparently the holding cell. Defendant Thomas tells Keaton to lift his feet so they can close the door, but he refuses to do so and, instead, yells f--- you at them multiple times. So, the officer tells the other officers to "go ahead and lift him up." (0:09). This officer also tells Keaton that he better not kick his staff. (0:20). Keaton continues to yell profanities at the officers and refuses to cooperate.

Then, out of nowhere, Keaton screams at the top of his lungs. (0:32). There are two officers in the holding cell and one in the doorway and none are doing anything to him that would have caused such a scream. They are simply trying to position him in a way that they can close the door. Thomas then tells Keaton to stand up, to which Plaintiff once again yells "f--- you". (0:51). Indeed, in the grievance, which he attaches to the second amended complaint, Keaton admits he "laid down with [his] feet out of the door so they couldn't close it." ECF Doc. 62 at 22-23. Keaton makes the same admission in his opposition to summary judgment. ECF Doc. 103 at 8. He further admits in the grievance that officers tried to lift his

---

[7] Keaton argues that "only after Major Hawkins arrives does defendant Thomas call for the handheld video camera". ECF Doc. 103 at 8. This argument is also belied by the video evidence as an officer with a handheld camera can be seen from the time Keaton is being carried from the sally port until the time he reaches the holding cell.

legs up 5-6 times so they could close the door but failed because he "stuck [his] legs out the door."  ECF Doc. 62 at 22-23.

Keaton alleges that once he was inside the holding cell "plaintiff was kicked in his surgically repaired eye, had his head hit several times on the steel bench inside of the holding cell, and defendants Thomas and Anthony repeatedly slammed the steel holding cell door against plaintiff's legs when the failed to move them."  ECF Doc. 62 at 8.  The video shows that none of those things occurred.

Plaintiff was not kicked in his surgically repaired eye, and even if he was – any such conduct was more likely to be accidental because of the size of the holding cell and Plaintiff's belligerent behavior, then conduct that was done sadistically or maliciously.  Moreover, any such contact was minimal as no visible bruising, swelling or injury to either eye can be seen on the video when Plaintiff is looking directly at the camera after he is placed in the second cell.

Similarly, while it is possible Keaton hit his head on the steel bench while in the holding cell, it was not because officers affirmatively hit Keaton's head on the bench.  Instead, it was because Keaton was physically resisting all efforts for officers to get him to stand up in a very small space.

Also, the video does not show Thomas, Anthony or any other officer slamming the steel holding cell door against Plaintiff's legs.  To the contrary, the

door is open the entire time and officers were standing in the doorway, which would have prevented any such slamming to have even occurred.

Because officers cannot get Keaton to stand up or lift his legs, they decided to move him to a different cell. As they are taking him out of the holding cell, one of the officers tells Keaton to get off his leg. Even after leaving the holding cell, Keaton continues to refuse to cooperate by trying to, once again, block the door of the second cell from closing. Keaton also continues to yell expletives at the officers, even after they have left the area and closed the door.

Because the video evidence blatantly contradicts Plaintiff's allegations, the Court must "view[ ] the facts in the light depicted by the videotape" and cannot adopt the version of the facts offered by the Plaintiff. *See Jones v. City of Cincinnati*, 736 F.3d 688, 692 (6th Cir. 2012); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Viewing the facts as depicted in the video evidence, the undersigned finds that each of the *Whitley* factors are met and no reasonable jury could find that excessive force was used.

Keaton alleges in his declaration that he did not kick or strike officers. ECF Doc. 103 at 1. As discussed above, the video does show Keaton kicking at officers

while in the sally port.  Moreover, Officer Roberts (who is not a Defendant) tells Keaton to get off his leg as they are in the holding cell.  (1:18).  Regardless, officers, do not have to wait to be kicked or struck before using force to gain control of a disruptive inmate.  *See Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990) ("Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding."); Florida Admin. Code 33-602.201(2)(a)6 (Correctional officers are authorized to utilize force in order to "overcome an inmate's physical resistance to a lawful command.").

Keaton was not only disruptive, but he was disobedient and belligerent.  His conduct was clearly a threat to officer safety.  Thus, there was the need for the application of some force.  *See Burke v. Brown,* 653 F. App'x 683, 696 (11th Cir. 2016) (affirming judgment for defendant and finding there was no question officers "had a significant need to bring Plaintiff under control," where evidence showed "Plaintiff was aware that a use-of-force team had been assembled and was warned that pepper spray would be used if he did not comply with officers' orders.  In response, Plaintiff shouted expletives at the officers and was otherwise hostile.").

The force used was minimal and consisted primarily trying to get Keaton under control so Defendants could move him was not more than necessary to regain order.  The video footage after the incident shows Keaton suffered no visible injuries

from the use of force incident.[8]   Keaton also alleges no specific physical injury in his second amended complaint, another indicia that the use of force was not more than necessary.[9]  *See Wilkins,* 595 U.S. at 37 ("The extent of injury may also provide some indication of the amount of force applied.  As we stated in *Hudson,* not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'").  "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim."  *Watson v. Edelen,* 76 F. Supp. 3d 1332, 1366–67 (N.D. Fla. 2015) (*citing, Hudson,* 503 U.S. at 9).

To the extent Plaintiff alleges the use of force caused additional damage to his eye, that allegation is also refuted by Dr. Brooks.  When Plaintiff asked Dr. Brooks about the condition of his eye on August 2, 2018, he responded:

> My eye exam would usually show -- if you had been traumatized to an eye, the eye would show a worsening of your retinal picture, and basically everything I saw was consistent with a very stiff retina from the very beginning.

ECF Doc. 100-4 at 13.

---

[8] According to the medial records, Medical personnel could not do a post use of force medical assessment of Plaintiff because of Plaintiff's "disruptive behavior".  ECF Doc. 100-3 at 55-56.

[9] Indeed, Keaton's lack of a more than *de minimis* physical injury prevents him from recovering compensatory or punitive damages, even if Keaton were able to overcome summary judgment on the Eighth Amendment claims.  *See Brooks v. Warden*, 800 F.3d 1295, 1307 (11th Cir. 2015) (collecting cases construing § 1997e(e) of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321 (1996)).

Finally, officers made several attempts to try to get Keaton to comply and temper the situation before using any force at all. They tried to talk to him for several minutes in the sally port. Once inside the holding cell, Thomas ordered Keaton on multiple occasions to stand up or lift his legs so they could close the door. Moreover, even once officers are finally able to move Keaton to another cell, they make efforts to avoid having to use chemical agents on him. As stated above, even after Keaton is moved from the holding cell to a permanent cell, he continues his recalcitrant behavior, resulting in Thomas giving him a final order to cease his behavior before chemical agents are used. At this point, a new officer approaches Keaton's cell, leans against it and talks him into calming down so that chemical agents do not have to be used.[10] As in *Burke*, the Defendants in this case, "went to great lengths to temper the severity of the force used, and indeed sought to avoid the use of force altogether." *See Burke,* 653 F. App'x at 696.

The conduct of these officers is far from "sadistic and malicious." Simply put, despite Keaton's constant profanity-laced tirades and non-cooperation, the officers remained restrained and professional and used very little force to get him to comply and to control the situation. No reasonable jury could find that such conduct was excessive force under the circumstances.

---

[10] According to infirmary progress records, the officer was Officer Williams, and Plaintiff did not calm down for two hours. ECF Doc. 100-3 at 51.

Case No. 4:19cv25-RH-HTC

Because the undersigned finds that Thomas did not violate Plaintiff's Eighth Amendment rights either by placing him on property restriction or using excessive force, Warden Coker cannot be liable under a theory of supervisory liability.[11]  *See Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed.").

### III.    CONCLUSION

For the reasons set forth above, the undersigned respectfully recommends the Defendants' motion for summary judgment be as to the Eighth Amendment claims as to all Defendants.  Because the undersigned finds in favor of Defendants on the federal claims, the state law claims should be dismissed.  A federal court may, and should, decline to exercise supplemental jurisdiction over claims after it has dismissed all claims over which it has original jurisdiction. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004).

---

[11] The undersigned also agrees with Defendants that Plaintiff failed to exhaust his administrative remedies.  Plaintiff alleges that Coker acted with deliberate indifference by failing to take disciplinary action "to curb a known pattern of abuse" by Thomas.  Plaintiff has not filed a grievance alleging that Coker failed to take any disciplinary action against Thomas and therefore has not exhausted his administrative remedies. *See* ECF Doc. 100-13, records custodians affidavits setting out his grievance history.  While Plaintiff contends he exhausted his administrative remedies as to all Defendants, he does not address this argument specifically.

Accordingly, it is respectfully RECOMMENDED:

1.     That the motion for summary judgment, ECF Doc. 100, be GRANTED,

and judgment entered in favor of Defendants on all federal claims.

2.     That the state law assault and battery claims be DISMISSED.

3.     That the clerk be directed to close the file.

Done at Pensacola, Florida, this 8th day of February, 2021.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**